UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
AMERICAN LEISTRITZ EXTRUDER  :
CORPORATION,                :
                            :
          Plaintiff,        :
                            :    Civil No. 05-3793 (AET)
                            :
                            :
POLYMER CONCENTRATES, INC., :
                            :    **VERDICT AND JUDGMENT**
                            :
          Defendant.        :
                            :
_____:

<u>THOMPSON, District Judge</u>

**BACKGROUND**

  This matter is before the Court for resolution of the parties' claims following a bench trial held before the Court from September 8 to 15, 2008. This case was previously tried to a jury from April 14 to 23, 2008 and resulted in a mistrial, after which, the parties requested a bench trial. Counsel were thorough in their presentations, and the following represents the Court's effort to resolve the parties' conflicting claims.

  Plaintiff American Leistritz Extruder Corporation is a New Jersey corporation which manufactures and sells extruder systems. Defendant Polymer Concentrates, Inc. is a Massachusetts corporation which manufactures and sells plastic materials.

  Plaintiff brought this action seeking to recover the unpaid portion of the purchase price for a ZSE-75HP extruder system Plaintiff sold to Defendant. Plaintiff also seeks to

recover on several other unpaid invoices for additional related equipment and a service visit.

Defendant answers that it did not accept the extruder equipment, but rather rejected it, or in the alternative, that it revoked its acceptance of the equipment, and therefore is not obligated to pay the balance of the contract price. Defendant also asserts counterclaims, alleging that Plaintiff breached its warranty by supplying equipment that did not function properly and failing to repair it and that as a result Defendant is entitled to direct and consequential damages, including the costs of repairing the system as well as the lost profits and other costs incurred as a result of the system's malfunction. Defendant also asserts a claim for tortious interference with prospective economic advantage.

Plaintiff seeks its attorney's fees incurred in recouping the purchase price, which it contends it is owed under a provision of the sales contract.

## FINDINGS OF FACT

Having heard and considered the testimony and exhibits presented at trial, the Court finds the following facts:

### Contract Formation

In or about February 2004, the parties entered into discussions about Defendant's potential purchase of a Leistritz ZSE-75HP extruder and various auxiliary equipment. On March 8, 2004, Plaintiff sent Defendant a quotation denoting pricing and specifications

for the extruder purchase. (Ex. P11.) On March 26, 2004, Defendant placed a purchase order (PO # 6900) for the extruder and its equipment, and Plaintiff confirmed the order with a "summary of understanding" on the same date. (Ex. P36.) In addition to confirming the order details, the March 26th confirmation extended the standard one year warranty, discussed below, for three years on the ZSE-75 extruder itself, the LSB-70 side stuffer and the control panels. On March 30, 2004, Defendant opted for an available upgrade on the extruder barrels, setting the final purchase price at $529,720. (Ex. P15.)

In addition to the above communications, which formed the parties' contract, the March 8th quotation references an additional document, Plaintiff's Standard Terms and Conditions, in two places: first in paragraph 7.0, stating that "the enclosed standard terms and conditions apply," and then again on the last page, listing the "Standard Terms and Conditions" as an enclosure. (Ex. P11.) These Standard Terms and Conditions provide in relevant part (1) the terms of the standard one year warranty, which the March 26th confirmation extended to three years on the extruder itself, the side stuffer and the control panels (Ex. P12 ¶ 9.); (2) that Plaintiff's liability is limited to exclude "any direct, indirect, incidental or consequential damages arising out of, connected with or resulting from goods or services furnished by [Plaintiff] ...." (Ex. P12 ¶ 10); and (3) that "[a]ny expenses incurred by [Plaintiff] for the collection of overdue payments, including attorney's fees, shall be payable by [Defendant] upon demand." (Ex. P12 ¶ 4.)

Defendant admits it received the March 8th quotation letter but denies ever receiving the Standard Terms and Conditions enclosure. (Tr. Sept. 12 at 150-54.) Plaintiff's witnesses, Kapp and Proscia, who were both involved in preparation of Plaintiff's quotes to customers, testified that these Standard Terms and Conditions were routinely included with Plaintiff's quotes. (Tr. Sept. 9 at 160-62, 212-14). Additionally, Plaintiff entered into evidence five previous quotes sent from Plaintiff to Defendant from 1991 through 2003, all of which referenced substantially similar Standard Terms and Conditions (Exs. P1-P10.), and Plaintiff's witness Bill Thiele testified that he routinely examined Plaintiff's quotations during that period of time to ensure that the Standard Terms and Conditions were enclosed along with the other listed enclosures. (Tr. Sept. 10 at 32-37.) For Defendant's part, Philips Christopherson, Defendant's founder, who was involved in negotiating the purchase, admitted on cross examination that it was not his practice to, and he in fact did not, check to see if the Terms and Conditions were included with the quotation, (Tr. Sept. 12 at 69), and John LeDoux, Defendant's Controller, testified that he did not see the Terms and Conditions when the quote reached him but that he assumed others at Defendant's offices had. (Tr. Sept. 12 at 152-54.)

**Initial Payments**

As required by the parties' agreement, Defendant made a deposit payment of $50,988 on April 23, 2004 and an additional payment of $264,860 upon delivery of the extruder on September 21, 2004. (Ex. P18.) The balance was due in two installments at

4

90 days and 180 days from the date of delivery.  (Ex. P54.)  Defendant also ordered and received additional, related equipment, totaling $41,859.75.  (Ex. P17.)  Defendant has made no further payments on any of these outstanding charges since September 21, 2004.

**Start-Up and Initial Difficulties**

Upon delivery of the extruder and its equipment, Wayne La Couture, Defendant's Plant Manager, undertook the installation of the machine in October 2004 and began the "start up" in November 2004.  LaCoutre contacted Plaintiff for assistance in installing and starting up the system, and Plaintiff sent a him a check list to follow.  (LaCoutre Tr. at 24-26.)[1]  However, LaCoutre was still unable to successfully start up the system, and Plaintiff dispatched Frank Eisenhower, Plaintiff's Parts Manager, to assist.  (LaCoutre Tr. 25-28.)  Eisenhower spent three days in Defendant's plant, and after correcting several problems with a battery, a cable and the PLC programming and performing a thorough check of the system, LaCoutre and Eisenhower successfully started the system and performed a small test run with satisfactory results.  (LaCoutre Tr. at 25-28; Tr. Sept. 9 at 77-80.)  While at Defendant's plant, Eisenhower critiqued elements of Defendant's setup of the machinery, including Defendant's cooling and material handling apparatuses, which would have an effect on the quality of the product produced by the system.  (Tr. Sept. 9 at 85-86.)

Before Eisenhower left at the end of the third day of his November visit,

---

[1] The trial testimony of Wayne LaCoutre from the April 2008 trial was admitted into evidence in its entirety at the bench trial.  Mr. LaCoutre did not testify at the bench trial.

Defendant reported to Eisenhower that there were no additional problems to be resolved, and Eisenhower then departed. (Tr. Sept. 9 at 87-88.)

Plaintiff billed Defendant $800 per day plus costs for Eisenhower's visit, as per paragraph 9.0 of the March 8 quote, summing to $3065.20. (Exs. P11, P17.) Defendant, however, maintains that Eisenhower was at the plant for less than three full days and failed to complete the start-up checklist and ran only a short test. Defendant's Controller reacted sharply to Plaintiff's invoice, writing on it by hand: "You gotta be kidding me" (Ex. D73), and did not pay the bill.

Defendant also maintains that soon after Eisenhower left Defendant's plant, the system started to malfunction. One persistent problem was that the Brabender feeders would start and stop on their own. As a result of this and other problems, Defendant was unable to achieve the throughput rates it sought and contends it was promised. Also, a delivery of 80,000 pounds of product that was run soon after Eisenhower left was rejected by one of Defendant's major customers. Defendant reported these problems to one of Plaintiff's employees, who was supposed to relay the concerns to Plaintiff's manager, Charles Martin. (Tr. Sept. 12 at 25-26.)

### Parties' Communications Regarding Malfunctions

After Eisenhower's November site visit, the parties' next communication was in December 2004. Defendant contacted Plaintiff to report a problem with the SSD drive. Plaintiff referred Defendant to the manufacturer of the drive. The manufacturer spent

6

several days addressing the problem. Defendant was not charged for this repair. Also in December 2004, Plaintiff's Martin called Phillips Christopherson, and, according to Martin, Christopherson reported that there were no further problems to be addressed. Christopherson, though, testified that he did not recall what he told Martin in that conversation, but that he is sure he did not report that all was well. (Tr. Sept. 12 at 57.)

On January 18, 2005 Christopherson called Martin and told him that Defendant was having difficulties with the Brabender feeders, and Martin scheduled a service visit with Burt Elliott, Plaintiff's Engineering Manager. Elliott met with LaCouture at Defendant's plant on January 24. During the meeting, LaCoutre gave Elliot a "punch-list" of problems Defendant was experiencing. However, Elliot did not observe the feeder stopping and starting problem during the visit, and he reported on his Field Service Report that the system was working well. (Ex. P27.) Still, after Elliot's visit, Defendant continued to experience problems with the feeders and the PLC controls, apparently due to a defect in the PLC programming. Eisenhower also made an additional visit in early February to address some of the minor modifications LaCoutre had requested when he met with Elliot.

Martin himself visited Defendant's facility on February 9, 2005 and met with Phillips and Scott Christopherson and LaCoutre. According to Defendant, they informed Martin of the malfunctions they were experiencing and that they thus far had been unable to achieve the throughput rates they had sought in purchasing the new machine.

7

Specifically, Defendant purchased the extruder expecting that it would achieve a rate of approximately 2500 pounds of material per hour but it only averaged 300 pounds. (Tr. Sept. 12 at 16-17.) Plaintiff, though, denies promising Defendant any particular rate (Tr. Sept. 11 at 50-51), and notes that the run sheets Defendant provided to Plaintiff on March 22, 2005, in fact record run rates of 895, 900, and 1,250 pounds per hour. (Tr. Sept. 12 at 53; Ex. P32-P33.) Of note, the March 8 quotation itself estimates the throughput rate at 1000 to 3000 pounds per hour. (Ex. P12.)

The parties next communicated on March 31, 2005 when the Christophersons approached Martin at a Massachusetts plastics trade show and again complained that they were not getting their expected throughput rate. Days before this encounter, on March 22, Martin had Augie Machedo, his lab manager, obtain reports on throughput from Defendant to investigate the problem. Upon review, Plaintiff gave Defendant some advice regarding run conditions, although Defendant denies Machado ever responded to Defendant after receiving the run sheets. Also, in mid-April, Defendant sent Plaintiff pictures of the screw configuration to further aid in identifying the source of the malfunctions.

At this point, the parties' relationship began to deteriorate precipitously. On May 5, Martin learned that Defendant had not paid the outstanding invoices. Martin called Christopherson, and Christopherson confirmed that Defendant would not pay Plaintiff until its issues were resolved, stating: "come up here and make it work and then we'll talk

8

about what we'll pay." (Ex. P37.) Martin responded on May 20 with a letter summarizing the events leading to the impasse and asking for a "path forward" but also informing Defendant that Plaintiff had put them on credit hold for parts and service from both Plaintiff as well as its sub-vendors. (Ex. P37.) Defendant responded through counsel on June 10, reiterating its position that the extruder had not functioned properly since start-up and that "[u]ntil the extruder is made to operate at the expected levels, the amount of [Defendant]'s damages can not [sic] be finalized and the balance due [Plaintiff] established .... [Defendant] has no intention of paying [Plaintiff] less than the amount properly due it and upon correcting the problems with the extruder will account to [Plaintiff]." (Ex. P48.)

Over the following weeks, the parties continued to correspond through counsel in an effort to avoid litigation but were ultimately unsuccessful. Plaintiff offered to perform a service visit free of charge to address the problem but required payment toward the outstanding balance first. Defendant declined that offer (Ex. P48), and Plaintiff filed the instant action on July 28, 2005.

Defendant, however, continued its efforts to make the extruder function properly, making additional repairs at its own expense. Defendant was finally successful in achieving the functionality it originally sought after several repairs, including the reprogramming of the PLC controls in 2007 and installing a new agitator in January 2008. (Tr. Sept. 12 at 21-22.)

9

**ANALYSIS**:

There is no question in this case that the March 8 quotation, the March 26 purchase order and confirmation and the March 30 upgrade communication formed a contract for the purchase of the extruder and related equipment. It is also undisputed that Defendant has not completed the payments called for by the contract. However, the parties dispute the terms of that contract, which party breached the contract and what the attendant damages are.

### Terms of the Contract

With respect to the terms of the contract, the parties dispute whether the Standard Terms and Conditions (Ex. P12), including its liability limiting and attorney's fees provisions described above, were included in the March 8th quotation package Plaintiff sent to Defendant. The Court finds that the Terms and Conditions were in fact included with the March 8th quotation based on the following: (1) the quotation itself references the Terms and Conditions in two places, (2) Plaintiff's witnesses testified credibly regarding the standard procedure of including the Standard Terms and Conditions and confirming their inclusion and (3) five prior quotes Plaintiff sent Defendant referenced and apparently included substantially similar Standard Terms and Conditions. Thus, the Court finds that the Standard Terms and Conditions are part of the purchase contract.

### Breach and Damages

With respect to which party breached its obligations under the contract and what

damages are due as a result, the Court notes the following provisions of the UCC. Under the UCC, Defendant must pay the contract price of any goods it has accepted, and if Defendant has failed to pay that price when it comes due, Plaintiff may recover that price. N.J. Stat. Ann. 12A:2-607; N.J. Stat. Ann. 12A:2-709(1). Defendant will be found to have accepted the extruder and accompanying equipment from Plaintiff if Defendant either affirmatively signaled its acceptance, failed to reject the goods by remaining silent after a reasonable time to inspect has passed, or took any action inconsistent with Plaintiff's ownership. N.J. Stat. Ann. 12A:2-606(1)(a)-(c). Defendant will be found to have rejected the goods only if Defendant notified Plaintiff of its rejection within a reasonable time after Defendant had an opportunity to inspect the goods. N.J. Stat. Ann. 12A:2-602(1).

However, even if Defendant is found to have accepted the extruder, under the UCC, Defendant may still have rightfully revoked its acceptance. Defendant will be found to have effectively revoked its acceptance, if (1) the extruder did not conform; (2) the non-conformity substantially impaired the value of the extruder to Defendant; (3) although Defendant knew of the non-conformity when it accepted the extruder, it acted on the reasonable assumption that Plaintiff would cure the defect, which was not seasonably cured; (4) Defendant revoked within a reasonable time after it discovered the extruder's defect and before any substantial change occurred in the condition of the extruder that was not caused by its own defect; and (5) Defendant notified Plaintiff of the revocation.

N.J. Stat. Ann. 12A:2-608.

Further, even if Defendant is found to have neither rejected the extruder nor revoked its acceptance, thus obligating it to pay the contract price, under the UCC Defendant may still deduct its own damages resulting from Plaintiff's breach of warranty from the price still owed under the contract. N.J. Stat. Ann. 12A:2-717.

### Defendant's Breach and Plaintiff's Damages

In this case, the Court finds that Defendant in fact accepted the extruder from Plaintiff by failing to either reject it or to revoke its acceptance. As the Court outlined above, Defendant was persistent in informing Plaintiff regarding the difficulties it encountered with the system. However, to effectively reject or revoke, Defendant must have notified Plaintiff of its rejection or revocation. Here, the parties' communications recounted at trial lack any definitive indication from Defendant that it was rejecting the extruder or revoking its acceptance. Instead, Defendant consistently insisted that Plaintiff assist in the repair of the extruder as required by the terms of the warranty Plaintiff provided, affirmatively signaling that Defendant was not rejecting or revoking. For instance, as late as mid-May 2005, Philips Christopherson told Martin: "come up here and make it work and then we'll talk about what we'll pay." (Ex. P37.) Similarly, at trial, in response to the Court's question, Defendant's counsel identified Defendant's letter of June 10 as the earliest evidence of revocation. (Tr. Sept. 12 at 80-81.) However, that letter does not constitute a revocation, but instead repeats Christopherson's position,

12

stating: "[u]ntil the extruder is made to operate at the expected levels, the amount of [Defendant]'s damages can not [sic] be finalized and the balance due [Plaintiff] established .... [Defendant] has no intention of paying [Plaintiff] less than the amount properly due it and upon correcting the problems with the extruder will account to [Plaintiff]." (Ex. P48.)  Thus, Defendant demonstrated that it intended to accept and keep the extruder, calculate and deduct its damages and then pay Plaintiff the adjusted contract price.  This course of action is distinctly not a rejection or revocation.  Finally, even if the June 10 letter could be construed as a revocation and Defendant could be said to have accepted upon the reasonable assumption that Plaintiff would repair the system, notice of revocation must be made within a reasonable time after the buyer has had an opportunity to inspect the goods accepted for non-conformities.  Here, the system was delivered in September 2004, start-up of the system was complete in early November 2004, and Defendant began to experience difficulties, that is, to notice non-conformities, almost immediately and then consistently thereafter.  But, by Defendant's own admission, the earliest evidence of revocation was in June 2005.  The Court finds that given that this revocation came more than six months after start-up and eight months after delivery and that the non-conformities were apparent to Defendant immediately after start-up, this revocation was not within a reasonable time.

     Therefore, it is the judgment of the Court that Defendant is liable to Plaintiff for the unpaid portion of the contract price.  Defendant is likewise liable to Plaintiff for the

price of the additional, related equipment as well as for the cost of Eisenhower's November site visit.  The final contract price was $529,720, the additional related equipment summed to $41,859.75 and the November visit cost $3065.20, for a total of $574,644.95.  Defendant has already made two payments, totaling $315,848.  Therefore Defendant's remaining liability to Plaintiff, before consideration of Defendant's damages, is $258,796.95.

<u>Plaintiff's Breach of Warranty and Defendant's Setoff</u>

However, the Court also finds that Plaintiff breached its express warranty that the equipment provided will be "free from defects in material and workmanship," as set out in the Standard Terms and Conditions.  (Ex. P12 ¶ 9.)  Under the warranty, Plaintiff was obligated to repair or replace defective parts or to refund the purchase price.  (Ex. P12 ¶ 9.)  Plaintiff contends that the equipment provided was in fact not defective or, in the alternative, that Defendant altered the equipment, thus relieving Plaintiff of its obligations under the terms of the warranty.  (Ex. P12 ¶ 9.)

The Court finds that the equipment Plaintiff supplied was partially defective.  For instance, the control panel programming was defective and was a substantial cause of Defendant's difficulty in making the system function properly, and as the Court will enumerate below in calculating the damages caused by Plaintiff's breach, Defendant itself bore the cost of replacing or repairing the programming along with several other necessary repairs.  As required by the UCC and the Standard Terms and Conditions,

Defendant gave Plaintiff notice of the breach by continually complaining of the system's malfunctions, starting in November 2004, within the one year warranty period starting in September 2004.  Further, as opposed to Plaintiff's characterization, Defendant's modifications were in fact legitimate efforts to repair the equipment after Plaintiff failed to fulfill its warranty obligations, not warranty-ending alterations.

Therefore, Defendant's liability under the contract will be setoff by the damages caused by Plaintiff's breach of warranty.  The UCC proscribes the measure of damages for breach of warranty as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.J. Stat. Ann. 12A:2-714(2).  Here, the Court finds that the correct and reasonable method of calculating these damages is to sum the costs incurred by Defendant in making the machine function properly, that is, the cost of making the equipment function as warranted.  The Court therefore finds that Defendant is entitled to damages for the following costs incurred: (1) $3,317.25 for a replacement panel; (2) $3,528.92 for replacement screws; (3) $20,617.41 for reprogramming of the controls; (4) $4,636.22 for changing the location of the vent; (5) $7,751.94 for reassembly of side stuffer; (6) $9,965.69 for replacing a blown motor; and (7) $52,034.03 for installation of an agitator. (Ex. D77.)  These costs sum to $101,851.46, and Defendant's liability will be setoff by that amount.  However, the Court will not further setoff Defendant's liability by the

amount it claims in incidental and consequential damages, including lost profits, waste, and other various costs, because such damages are precluded by the Standard Terms and Conditions, which the Court has already found were part of the contract, and are not properly recovered as a remedy for the breach of warranty.  Further, the Court finds that Defendant failed to meet its burden in presenting sufficient evidence in support of these damages.

### Tortious Interference Claim

Defendant also asserts an additional claim that by imposing the credit hold, Plaintiff tortiously interfered with Defendant's prospective economic relationships with Plaintiff's sub-vendors.  To prevail on a claim for tortious interference with prospective economic advantage, Defendant must prove the following four elements: (1) a reasonable expectation of economic advantage from a prospective contractual or economic relationship; (2) that Plaintiff interfered with this advantage intentionally and with malice—that is without justification or excuse; (3) that the interference caused the loss of the expected advantage; (4) and that the interference caused damage.  See Printing Mart-Morristown v. Sharp Elec. Co., 563 A.2d 31, 37 (N.J. 1989).  The Court finds that Defendant has failed to prove the elements of a loss of the expected advantage and damage caused thereby.  Philips Christopherson testified that the credit hold had "very little" impact on Defendant's business, characterizing it as a "little inconvenience, maybe." (Tr. Sept. 12 at 71.)

Plaintiff's Attorney's Fees

Finally, in addition to its claims for unpaid invoices, Plaintiff claims that Defendant is liable for Plaintiff's attorneys' fees incurred in recovering the contract price, which, according to Plaintiff's Exhibit 49, totals $280,552.20.

The Standard Terms and Conditions provide in paragraph four that "[a]ny expenses incurred by the Seller for the collection of overdue payments, including attorney's fees, shall be payable by Buyer upon demand." The Court therefore finds that Defendant is liable to Plaintiff for the attorney's fees incurred in litigating this matter.

However, in awarding attorney's fees provided for by contract, because of "New Jersey's strong policy disfavoring the shifting of attorney's fees," the Court will review the award for reasonableness and treats the award of damages like any other claim for contractual damages that must be proven and are subject to the doctrines of contract law. See N. Bergen Rex Transport Inc. v. Trailer Leasing Co., 730 A.2d 843, 848 (N.J. 1999); Belfer v. Merling, 730 A.2d 434, 443-44 (N.J. Super. 1999).

Here, two considerations counsel against awarding Plaintiff its full attorney's fees. First, Plaintiff was only successful in recovering approximately 60% of its claimed damages because of the setoff due to Defendant's damages. Plaintiff's attorney's fees should be reduced accordingly. See N. Bergen Rex Transport Inc., 730 A.2d at 850-51 (using this method of reducing contractual attorney's fees to a reasonable amount). Second, the Court finds that while Defendant is liable to Plaintiff for the contract price

because it failed to take the steps proscribed under the UCC to properly reject the extruder or revoke its acceptance, it would be unconscionable to award Plaintiff its entire attorney's fees. As enumerated above, Defendant encountered numerous and repeated difficulties in making the extruder system operate properly, and these difficulties were in part due to Plaintiff's breach of warranty. The Court also notes that the $280,552.20 in attorney's fees reflected in Plaintiff's Exhibit 49 does not include the full fees associated with the bench trial, as that exhibit is dated August 20, 2008, and that the total attorney's fees is likely appreciably higher. Therefore, it is the judgment of the Court that Plaintiff is awarded $60,000 in attorney's fees.

**CONCLUSION**

For the foregoing reasons, and for good cause shown,

IT IS on this 12th day of November, 2008,

ORDERED that Plaintiff American Leistritz Extruder Corporation is awarded $258,796.95 as the balance of the contract price owed to it; and it is further

ORDERED that Plaintiff is awarded $60,000 in attorney's fees; and it is further

ORDERED that Defendant Polymer Concentrates, Inc. is awarded $101,851.46 in damages for breach of warranty; and it is further

ORDERED that judgment be entered in favor of Plaintiff against Defendant in the amount of $216,945.49; and it is further

ORDERED that this case is CLOSED.

s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.